UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2010-183 (WOB-JGW)

WILLIAM J. BRAMBLE, JR.,
ET AL.                                                    PLAINTIFFS

VS.            MEMORANDUM OPINION AND ORDER

CAMPBELL COUNTY, KENTUCKY,
ET AL.                                                    DEFENDANTS
_____

This is an action by former detainees at the Campbell County Detention Center (CCDC) against the jail, and against Southern Health Partners (SHP), alleging cruel and unusual punishment in violation of the 5th, 8th, and 14th Amendments and plaintiffs' civil rights under 42 U.S.C. § 1983.  Plaintiffs also allege state law claims.

This matter is before the Court on the motion of the Campbell County defendants for summary judgment as to plaintiff, Doug Menning (Doc. 82), and the motion for partial summary judgment of Southern Health Partners, as to plaintiff, Doug Menning (Doc. 81).

Having reviewed the parties' briefs, the Court concludes that oral argument is unnecessary to the resolution of these motions.  The Court therefore issues the following Memorandum Opinion and Order.

*FACTS*

**A.   Facts Common to All Claims**

Since February 1, 2007, the CCDC has had a contract with SHP pursuant to which SHP provides "all professional medical, mental health, dental and related health care and administrative services" for CCDC inmates, including sick call, nursing care, regular and emergency physician care. (Holt, Doc. 132 Ex. 1).[1]  SHP, in turn, contracts with a physician and employs nurses to staff the CCDC.  These arrangements were in place at all times relevant to this action.

Plaintiffs filed this case on August 27, 2010, as a proposed class action.  (Doc. 1).  On September 24, 2010, plaintiffs filed a Second Amended Class Action Complaint, which is the operative complaint herein.  (Doc. 5). Plaintiffs allege that they were denied medical attention for their serious medical needs in violation of their 5th, 8th and 14th Amendment rights.  (Doc. 5 ¶ 16, ¶¶ 366-69). Plaintiffs also allege Kentucky statutory claims (Id. at ¶¶ 370-71), negligent or intentional infliction of emotional distress (Id. at ¶¶ 372-73), negligence (Id. at ¶¶ 374-75), loss of consortium (Id. at ¶¶ 376-77), and wrongful death

---

[1] This case is related to *Holt v. Campbell County*, Covington Civil Action No. 09-82 and references to the Holt record are cited as "Holt,_____."

2

(Id. at ¶¶ 378-79).

On March 25, 2011, the parties stipulated to dismissal of plaintiffs' class action allegations. (Doc. 28). Discovery ensued and, after numerous extensions, the pending motions for summary judgment were filed and briefed.

**B.  Plaintiff Doug Menning**

Doug Menning ("Menning") was arrested on May 28, 2010, and incarcerated at the CCDC from May 29, 2010 to June 7, 2010. (Doc. 82 Ex. 11).

When Menning was admitted to the CCDC, he indicated he had psychiatric and drug dependency problems, specifically that he would withdraw from Methadone and Xanax. (Doc. 82 Ex. 3). In addition, Menning was advised that he could seek medical care, and that the Rules and Regulations of the CCDC were displayed on channels 1 and 6 of CCDC's Television Broadcast System. (Doc. 82 Ex. 4, 5). On May 29, 2010, the SHP staff saw Menning and completed a Medical Staff Receiving Form, again noting his addiction to Methadone and Xanax, and starting him on a withdrawal flow sheet. (Doc. 81 Ex. 5, 6). Menning was seen again on May 29, where the nurse noted that Menning complained of chest pain and that he was instructed on deep breathing techniques. (Doc. 81 Ex. 8).

It appears that on May 31, 2010, Menning filled out an Inmate Sick Call slip complaining that he was going through Methadone withdrawal. (Doc. 81 Ex. 7). On June 3, 2010, Menning's family brought in a Nexium prescription which was administered on June 4-6. (Doc. 81 Ex. 8, 9).

The CCDC Incident Reports show Menning became agitated on June 6, 2010 at 5:25 a.m. (Doc. 82 Ex. 10). He began being disruptive, yelling profanities at the guards, and presenting an aggressive demeanor. (Id. at CC. 795). Menning was removed from the area and placed in isolation. (Id.) Further, Deputy Germany noted that Menning should be "referred to medical for psych evaluation." (Id.) By 6:00 a.m. Menning was banging on his cell door and displaying increasingly odd behavior. (Id. at CC 794). Menning was taken to see Cpl. Miskall and again exhibited very odd behavior, so he was placed into a restraint chair until he calmed down or medical could see him. (Id.) Cpl. Miskall also requested Menning see the psychiatric nurse. (Id.)

Menning was returned to his cell, but at 4:13 p.m. he again began kicking his cell door, slamming the restroom door into his cell door, and yelling at the guards. (Id. at CC 792). Menning was eventually removed from the cell, when pepper spray was presented but not used, and placed in the restraint chair. (Id. at CC 793). At 5:30 p.m.,

4

Menning was offered the opportunity to leave the restraint chair but he continued to yell at the guards. (Id.) At 6:40 p.m., Menning was removed from the restraint chair and placed back into a cell. (Id.) At 8:55 p.m. Menning began kicking his cell door again, which escalated to him punching the cell window with his fist. (Id. at CC 789). To prevent injury to Menning, the guards told him they were going to place him in the restraint chair again. (Id.) Eventually, the guards attempted to use a Mk-9 High Volume Stream OC Canister, but it was defective and failed. (Id. at CC 790). The Guards then retrieved a Mk-9 High Volume Fogger OC canister and proceeded to spray Menning for approximately one second. (Id.) After this, Menning became compliant and was placed in the restraint chair. (Id.)

Menning was released on June 7, the next day, and transported to St. Elizabeth Hospital in Edgewood, Kentucky. (Doc. 82 Ex. 11, 12). The emergency room conducted a physical exam of Menning, identifying no physical abnormalities but noting paranoia and delusions. (Doc. 82 Ex. 13). Menning was sent to behavioral health, where he was diagnosed with "[e]ncephalopathy with acute psychosis probably secondary to withdrawal of alcohol, methadone and Xanax." (Doc. 82 Ex. 14). He was released

5

in stable condition on June 10, 2010.  (Doc. 82 Ex. 15).

Menning's deposition testimony is in direct conflict with most of the extensive record.  Menning alleges his mother brought in his medications on June 4, 2010.  (Doc. 128-1 p. 80, 176).  Menning wanted to see a doctor because he was having chest pains, back pain, and anxiety, but every time the unnamed nurse came around, she would tell Menning the doctor only came once a month.  (Doc. 128-1 p. 81).

After three days, Menning was having chest pain, lightheadedness, thirst, and fatigue.  (Doc. 128-1 p. 168). Menning had no access to water because the sink in his cell was broken.  (Doc. 128-1 p. 172-73).  By June 4, Menning was vomiting; by June 5 he was experiencing sleeplessness. (Doc. 128-1 p. 175-77, 179-80.)  On June 6, Menning alleges he was woken up from a nightmare and was put in the hole. (Doc. 128-1 p. 181-84).

Menning started to panic while in the hole, because he could not breathe, and he started to bang on the door. (Doc. 128-1 p. 184).  He was then removed from the hole and placed in a restraint chair.  (Doc. 128-1 p. 185).  Menning alleges the guard put a mask over his head, and then sprayed pepper spray inside the hood.  (Doc. 128-1 p. 185). While in the restraint chair, Menning asked for medical

6

assistance, and the same nurse from med pass came with two cups, one with water and the other with four pills that were not Menning's. (Doc. 128-1 p. 189-90). Menning alleges that a deputy put pepper spray in the water, and made him take the pills and then he was placed in a holding cell. (Doc. 128-1 p. 190-92.)

While in the holding cell, Menning became disoriented, began screaming for help, and was again placed in the restraint chair a second time. (Doc. 128-1 p. 192-93). The deputies tightened the restraints too much causing a loss of feeling in two of Menning's fingers. (Doc. 128-1 p. 193).

After more than six hours, the guards then took him out of the restraint chair and put him in another room. (Doc. 128-1 p. 197-98). Three guards then came and attempted to fog the room with pepper spray, but failed, and then returned and were successful. (Doc. 128-1 p. 199-200). The guards then stripped Menning, threw him in the shower, and put him back in the restraint chair a third time. (Id.) The pepper spray caused severe burns to Menning's skin. (Doc. 128-1 p. 202).

Menning passed out while in the restraint chair the third time. (Doc. 128-1 p. 199, 204). When he awoke, he was in an observation cell, he saw Judge Popovich walk by

and look at him, and Kim Turner had his "OR papers" to release him from the jail. (Doc. 128-1 p. 204). Even after receiving his release papers, Menning was held until Newport police arrived, who transported him to "a jail hospital in Kenton County, Kentucky at Edgewood." (Doc. 128-1 p. 208-09).

These injuries have caused Menning to be unable to grasp anything, stand for long periods, his endurance is low, he has yet to recover from tightness in his chest, he has continuing nightmares, and suffers from emotional fear and pain. (Doc. 128-1 p. 233-34).

Plaintiff offers his expert, Dr. Joseph Paris, in support of his claims. In Dr. Paris's opinion, the management of Menning's withdrawal syndrome "reached the level of deliberate indifference and resulted in Menning having to endure about 10 days of horrible multisubstance withdrawal with psychosis, 18 hours in the restraint chair, being pepper sprayed while psychotic and, in general, having his life in grave danger during the whole episode." (Doc. 101 Ex. 7).

Dr. Paris states that SHP paid no attention to Menning's multiple drug dependency, that Xanax should never be discontinued abruptly, and that Methadone should be tapered off. (Doc. 101 Ex. 7). He further opines that

Menning should never have been placed in a restraint chair and that this put his life in danger because death is common in such situations, usually due to dehydration, kidney or liver failure, respiratory failure, and rhabdomyolysis. Dr. Paris also states, however, that an "institutional strength" was Menning being placed on a withdrawal protocol and, once his severe withdrawal symptoms were recognized, he was transferred to the ER. (Doc. 101 Ex. 7).

SHP's Expert Dr. Grady Bazzel, stated that "waiting for a withdrawal state to declare itself prior to the initiation of treatment is a clinically sound method" because inmates could: (1) be confused about the prescriptions they take (the closeness of Xanax and Zantac for example) or (2) because inmates could be "out-right disingenuous about their medications in hopes of receiving mood altering medications to prevent a withdrawal that will never come." (Doc. 58 Ex. A p. 11-12). Dr. Bazzel also declares that "Mr. Menning was treated appropriately during his incarceration. I see no elements of malpractice or deliberate indifference." (Doc. 58 Ex. A p. 12).

### *Analysis*

A.  **Legal Standards**

Section 1983 prohibits any "person who, under color of

any statute, ordinance, regulation, custom, or usage, of any State" from depriving any U.S. citizen "of any rights, privileges, or immunities secured by the constitution and laws."  Plaintiff argues that his Fourteenth Amendment right to adequate medical care was violated, which is analogous to prisoners' Eighth Amendment rights to be free from cruel and unusual punishment.  "The Eighth Amendment does not apply to pretrial detainees. Under the Fourteenth Amendment Due Process Clause, however, pretrial detainees have a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001).

"As applied to prisoners, this constitutional guarantee encompasses a right to medical care for serious medical needs."  *Perez v. Oakland County*, 466 F.3d 416, 423 (6th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)).  However, because the Eighth Amendment prohibits mistreatment only if it is tantamount to "punishment," courts have imposed liability upon prison officials only where they are "so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain."  *Perez*, 466 F.3d at 423 (internal quotations and citation omitted).

10

"Negligence or medical malpractice alone cannot sustain an Eighth Amendment claim, absent a showing of deliberate indifference." *Id.* (citing *Estelle*, 429 U.S. at 105-06).

"Deliberate indifference" has both an objective and a subjective component. *Id.* (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)). With respect to medical needs, the need "must be objectively, 'sufficiently serious.'" *Id.* at 423-24 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

"In considering the subjective component, this circuit has emphasized that a plaintiff must produce evidence showing that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* at 424 (internal quotations and citation omitted). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). *See also id.* at 842 (official must act or fail to act "despite his knowledge of a substantial risk of serious harm").

The subjective component "prevents medical-malpractice

claims from being transformed into constitutional claims." *Quigley v. Thai*, 707 F.3d 675, 681 (6th Cir. 2013) (citation omitted).

    **B.**    <u>**Qualified Immunity**</u>

Assuming a plaintiff raises a triable issue as to whether a constitutional violation occurred, a public official sued in his or her individual capacity may still be shielded from suit under the doctrine of qualified immunity. All defendants here assert this defense.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

    **C.**    <u>**Application to Menning's Claims**</u>

        **1.**    **Objectively Serious Medical Need**

The parties, for purposes of summary judgment, concede

Menning's withdrawal symptoms were an objectively serious medical need. However, Menning fails to establish the subjective component because none of the named defendants had any contact with him.

### 2. Deliberate Indifference: Subjective Component

Even though Menning's medical condition was a serious medical need, there is no evidence from which a reasonable jury could conclude that any of the defendants were deliberately indifferent to his medical needs.

#### a. CCDC Defendants

Plaintiff argues that defendants Buckler and Fickenscher were aware of facts from which they could, and did, draw an inference that a substantial risk of serious harm existed as to Menning's health. This argument fails as a matter of law because there is no such evidence in the record.

There is no evidence that Buckler or Fickenscher had any contact with Menning during his incarceration, were aware of his medical condition, or were aware of any of his symptoms. Menning never filed a grievance and there is no other evidence showing that either official knew of Menning's medical need. Further, Menning never identifies any point when either Buckler or Fickenscher had knowledge

13

of specific facts of his medical situation.

Because there is no evidence that Buckler or Fickenscher knew anything about Menning's health, they could not have been deliberately indifferent and the subjective element fails as a matter of law. Because *respondeat superior* is not available as a basis for liability under § 1983, Buckler and Fickenscher are entitled to summary judgment.[2]

With no underlying constitutional violation, Menning can state no "municipal liability" claim as to Campbell County. *See Blackmore v. Kalamazoo* County, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers.") (citation omitted).

For these reasons, all the CCDC defendants are entitled to summary judgment.[3]

### b. SHP Defendants

With respect to the SHP defendants, the Court first

---

[2] Menning argues that Buckler and Fickenscher were aware of general problems with the medical contractor at the CCDC. That, however, provides no basis for the claim against them in their individual capacities where it is undisputed that they played no role in Menning's care.

[3] The Court thus need not reach the issue of qualified immunity, although the individual defendants would obviously be entitled to that defense given the absence of any constitutional violation.

recognizes that Menning has abandoned his individual § 1983 claim against Dr. Waldridge. (Doc. 101 p. 1). Plaintiff, however, continues to pursue his claim against Nurse. (Id.)

Menning's argument showing deliberate indifference of Nurse Dawes states no facts from which to make such a finding. Instead, Menning simply asserts Nurse Dawes meets the subjective standard, then lays out the subjective legal standard, with no facts that show Nurse Dawes had information that would allow her to make an inference that there was a serious risk of harm and that she made such an inference. (Doc. 101 p. 7-8). The only facts Menning points to are "general knowledge" facts, i.e., that Nurse Dawes was aware of complaints about withdrawal symptoms from inmates because they did not receive their narcotic pain medication, complaints from staff members about running out of certain medications, and that there were withdrawal protocols for different drugs. (Doc. 101 p. 7-8).[4] These generalized facts are not enough to satisfy a finding of deliberate indifference.

Further, to overcome summary judgment, the opposing

---

[4] It appears the parties are citing to two different Nurse Dawes depositions. The Plaintiff is utilizing a deposition filed in the related *Holt* case, while SHP is citing to a deposition that does not appear to be in the record at all.

party must present some affirmative evidence showing there is a genuine issue of material fact and cannot simply rest on its allegations.  *Hunley v. DuPont Auto.*, 341 F.3d 491, 496 (6th Cir. 2003).  The trial court has no obligation to "wade through" the record in search of specific facts to support the party's claim, nor is it required to speculate as to which portion of the record the party relies.  *United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993).  The Sixth Circuit has held that, even where evidence exists somewhere in the record, it is the duty of the nonmoving party to bring that evidence to the Court's attention.  *Parsons v. FedEx Corp.*, 360 F. App'x 642, 646 (6th Cir. 2010).  Because Plaintiff offers no evidence on which it relies for its conclusory statement that Nurse Dawes was deliberately indifferent, his argument fails as a matter of law, and Nurse Dawes is entitled to summary judgment.

   Menning also has adduced no admissible evidence of a clear and persistent pattern of deliberate indifference to inmate medical needs.  This Court has already held in another case that the same affidavits submitted by Plaintiff here regarding allegedly poor care at the CCDC are: (1) inadmissible for a variety of reasons, and (2) even if admissible, inadequate as a matter of law to support a municipal liability claim against Campbell County

16

or SHP.  *Fryman v. Campbell County*, Covington Civil Action No. 09-114-WOB-JGW, Docs. 25, 30.

With no underlying constitutional violation, Menning can state no "municipal liability" claim as to SHP.  *See Blackmore v. Kalamazoo* County, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers.") (citation omitted).

Finally, the report of Menning's expert witness, Dr. Joseph Paris, raises no triable issue.  (Doc. 101 Ex. 7). According to Dr. Paris, CCDC's withdrawal management of Menning rose to the level of deliberate indifference. (Doc. 101 Ex. 7).  This, however, is an improper conclusion of law that goes to the ultimate issue and is not admissible at trial.  *Cutlip v. City of Toledo*, 488 F. App'x 107, 119-21 (6th Cir. 2012).  As such, it raises no genuine issue of material fact.

Finally, Dr. Paris's report is silent as to the subjective perception of these defendants, and the record thus remains devoid of evidence that would satisfy this element.

All defendants are thus entitled to summary judgment on Menning's § 1983 claim.  Given this disposition, the Court will decline to exercise its supplemental

jurisdiction over Menning's state law claims.  *See* 28 U.S.C. § 1367(c).[5]

Therefore, having reviewed this matter, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** (1) that the motion of the Campbell County defendants for summary judgment as to plaintiff, Doug Menning (Doc. 82) be, and is hereby, **GRANTED AS TO PLAINTIFF'S FEDERAL CLAIM;** (2) the motion of Southern Health Partners for partial summary judgment as to plaintiff, Doug Menning (Doc. 81) be, and is hereby, **GRANTED AS TO PLAINTIFF'S FEDERAL CLAIM**; and (3) Plaintiff Doug Menning's state law claims be, and are hereby, **DISMISSED WITHOUT PREJUDICE.**

This 26th day of September, 2013.



Signed By:
William O. Bertelsman  WOB
United States District Judge

---

[5] The Court notes that Menning concedes the state law claims against Campbell County should be dismissed, as well as the outrage and loss of consortium claims against Buckler and Fickenscher.  (Doc. 82 p. 1).  Menning also concedes all claims against Dr. Waldridge should be dismissed, and the state regulatory, loss of consortium and outrage claims against all the SHP defendants should be dismissed.  (Doc. 81 p. 1).