**CIVIL ACTION NO. 2010-183 (WOB-JGW)**

**WILLIAM J. BRAMBLE, JR.,**
**ET AL.**                                                    **PLAINTIFFS**

**VS.**                    <u>**MEMORANDUM OPINION AND ORDER**</u>

**CAMPBELL COUNTY, KENTUCKY,**
**ET AL.**                                                    **DEFENDANTS**

_____

This is an action by former detainees at the Campbell County Detention Center (CCDC) against the jail, and against Southern Health Partners (SHP), alleging cruel and unusual punishment in violation of the 5th, 8th, and 14th Amendment and plaintiffs' civil rights under 42 U.S.C. § 1983. Plaintiffs also allege various state law claims.

This matter is before the court on the motion of the Campbell County defendants for summary judgment as to plaintiff, Kimberly Eversole, both individually and as the Administratrix of Michael Webb's estate (Doc. 74), and the motion for partial summary judgment of Southern Health Partners, as to plaintiff, Kimberly Eversole, both individually and as the Administratrix of Michael Webb's

estate (Doc. 75).[1]

Having reviewed the parties briefs and having conducted oral argument on September 27, 2013, the Court issues the following Memorandum Opinion and Order.

## IV.    FACTS

### A.    Facts Common to All Claims

Since February 1, 2007, the CCDC has had a contract with SHP pursuant to which SHP provides "all professional medical, mental health, dental and related health care and administrative services" for CCDC inmates, including sick call, nursing care, regular and emergency physician care. (Holt, Doc. 132 Ex. 1).[2]  SHP, in turn, contracts with a physician and employs nurses to staff the CCDC.  These arrangements were in place at all times relevant to this action.

Plaintiffs filed this case on August 27, 2010, as a proposed class action.  (Doc. 1).  On September 24, 2010, plaintiffs filed a Second Amended Class Action Complaint, which is the operative complaint herein.  (Doc. 5). Plaintiffs allege that they were denied medical attention

---

[1] The Court recognizes these as two different plaintiffs, however, for ease of reading, will refer to simply "the Plaintiff."

[2] This case is related to *Holt v. Campbell County*, Covington Civil Action No. 09-82 and references to the Holt record are cited as "Holt,_____."

for their serious medical needs in violation of their 5th, 8th and 14th Amendment rights.  (Doc. 5 ¶ 16, ¶¶ 366-69). Plaintiffs also allege Kentucky statutory claims (*Id.* at ¶¶ 370-71), negligent or intentional infliction of emotional distress (*Id.* at ¶¶ 372-73), negligence (*Id.* at ¶¶ 374-75), loss of consortium (*Id.* at ¶¶ 376-77), and wrongful death (*Id.* at ¶¶ 378-79).

On March 25, 2011, the parties stipulated to dismissal of plaintiffs' class action allegations.  (Doc. 28). Discovery ensued and, after numerous extensions, the pending motions for summary judgment were filed and briefed.

**B.    Plaintiff Kimberly Eversole, Adminstratix of Michael Webb's Estate, and individually.**

Michael Webb ("Mr. Webb") was incarcerated at the CCDC from April 17, 2009 to September 22, 2009.  (Doc. 74 Ex. 3, 23).  He was forty-seven years old at the time he began this incarceration.  (Doc. 74 Ex. 3).

Mr. Webb told the booking officer when admitted to the CCDC that he had a hernia which required medical treatment, but otherwise had no medical conditions for which he required treatment or medication.  (Doc. 74 Ex. 4).

There is a debate between the parties about when the first "Inmate Sick Call slip" was filed.  The CCDC

for their serious medical needs in violation of their 5th, 8th and 14th Amendment rights.  (Doc. 5 ¶ 16, ¶¶ 366-69). Plaintiffs also allege Kentucky statutory claims (*Id.* at ¶¶ 370-71), negligent or intentional infliction of emotional distress (*Id.* at ¶¶ 372-73), negligence (*Id.* at ¶¶ 374-75), loss of consortium (*Id.* at ¶¶ 376-77), and wrongful death (*Id.* at ¶¶ 378-79).

On March 25, 2011, the parties stipulated to dismissal of plaintiffs' class action allegations.  (Doc. 28). Discovery ensued and, after numerous extensions, the pending motions for summary judgment were filed and briefed.

**B.    Plaintiff Kimberly Eversole, Adminstratix of Michael Webb's Estate, and individually.**

Michael Webb ("Mr. Webb") was incarcerated at the CCDC from April 17, 2009 to September 22, 2009.  (Doc. 74 Ex. 3, 23).  He was forty-seven years old at the time he began this incarceration.  (Doc. 74 Ex. 3).

Mr. Webb told the booking officer when admitted to the CCDC that he had a hernia which required medical treatment, but otherwise had no medical conditions for which he required treatment or medication.  (Doc. 74 Ex. 4).

There is a debate between the parties about when the first "Inmate Sick Call slip" was filed.  The CCDC

defendants assert that a Sick Call Slip was submitted June 18, 2009, (Doc. 74 p. 3,) while the Plaintiffs assert it was submitted May 18, 2009 (Doc. 99 p. 2) (hereinafter referred to as "the First Sick Call Slip"). On its face, the sick call slip appears to have been filled out May 18, 2009 but the "Received" stamp says June 19, 2009. (Doc. 74 Ex. 6). It is unclear from the facts presented by any party what occurred in the interim. The First Sick Call Slip stated:

> I have yellow skin tone and might have been exposed to hepatitis (c) through intravenous drug use and unprotected sex. I'm requesting to be tested, blood work up.
>
> How long have you had this problem? 6 months, on & off, more continuous discolored last 30 days.

(Doc. 74 Ex. 6)

The Second Sick Call Slip was submitted June 23, 2009. It stated:

> Been told I'm 'Jaundice' of color numerous times, possibly exposed to herpatit [sic] through intravenous drug use/unprotected [sic] request blood work.
>
> How long have you had this problem? Approx. 3 wks.

(Doc. 73 Ex. 7) (hereinafter "the Second Sick Call Slip").

On June 23, 2009, the day of the Second Sick Call Slip, Mr. Webb was seen by Nurse Betty Dawes. (Doc. 74 Ex. 8). On this Patient form, Nurse Dawes stated "Color: Race Appropriate: Checked" and she placed Mr. Webb on the

Physician's List to be seen.  (*Id.*)

On July 10, 2009, Mr. Webb submitted his first grievance.  (Doc. 74 Ex. 9).  In this grievance, Mr. Webb states he was seen by the nurse on July 3, 2009, and placed on the physician's list and he also reasserts his desire to be seen by the doctor.  (*Id.*)  Lt. Col. Fickenscher received the grievance on July 15, 2009, and responded on July 17, 2009.  (Doc. 74 Ex. 10).  In Lt. Col. Fickenscher's response, he states he forwarded the grievance to medical for information, and medical informed him that Mr. Webb was on the list to the see the Doctor, and the Doctor would make the decision to see him.  (*Id.*)

The Medical Staff Response form indicates that the Doctor reviewed Mr. Webb's chart and chose not to conduct an in-person exam.  (Doc. 74 Ex. 11).  It also indicates that Mr. Webb was added to the Doctor's list to be seen again.  (*Id.*)

Another grievance was filed on an unknown date, addressed to defendant Buckler.  (Doc. 99 Ex. 8).  It was stamped July 16, 2009, apparently as a received date. (*Id.*)  No one ever responded to this grievance.  (Doc 99 p. 2).  The Plaintiff alleges this grievance was sent before the first grievance had a response.  (Doc 99 p. 2).

A third grievance was submitted on July 19, 2009.

(Doc. 99 Ex. 9).  Again Mr. Webb states his request to see
the Doctor and have blood work taken.  (*Id.*)  This
grievance was responded to on July 20, 2009 by Capt.
Talbot.  (Doc. 99 Ex. 10).  It was also responded to on
July 22, 2009, by Lt. Col. Fickenscher, who stated he
forwarded the grievance to medical and medical responded
that the issue was resolved.  (Doc. 74 Ex. 13).

Dr. Waldridge made notes on Mr. Webb on July 22, 2009.
(Doc. 74 Ex. 14).  Blood tests were done and the results
were completed on July 25, 2009, showing elevated
bilirubin, AST, and ALT levels.  (Doc. 74 Ex. 15).  Dr.
Waldridge had follow up tests and a hepatic profile
completed on July 31, 2009, which showed a positive result
for Hepatitis C and elevated bilirubin, AST, and ALT
levels.  (Doc. 73 Ex. 16).  Due to these blood test
results, Dr. Waldridge ordered an abdominal ultrasound for
Mr. Webb.  (Doc. 74 Ex. 14 p. CC 1513).

On August 5, 2009, Mr. Webb was taken to an outside
consultant for an abdominal ultrasound which revealed
additional medical issues.  (Doc. 74 Ex. 17).  Dr.
Waldridge indicated there was little treatment applicable
to elevated liver functions but stated it was a situation
that must be monitored.  (Doc. 75 Ex. 2 p. 83).

On August 17, 2009, Mr. Webb submitted another sick

call slip complaining of an upset stomach possibly caused by the milk on cereal days. (Doc. 74 Ex. 18). On August 18, 2009, Mr. Webb was still complaining of abdominal pain and was monitored throughout the night on August 18. (Doc. 74 Ex. 14 p. CC 1511). On August 19, 2009, the nursing staff contacted Dr. Waldridge who ordered Mr. Webb to be sent to Dr. Davenport, an outside physician, for a surgical consultation. (*Id.*) Mr. Webb was evaluated by Dr. Davenport and then sent to St. Elizabeth Hospital for further assessment and treatment. (*Id.*) The hospital confirmed a diagnosis of hepatitis C and cirrhosis of the liver and discharged Mr. Webb. (Doc. 74 Ex. 19 p. SHP Bramble 2983).

On August 31, 2009, Mr. Webb filled out a sick call slip complaining of stomach pain. (Doc. 73 Ex. 20). He was seen on September 7, 2009 by the medical staff, and again on September 10, 2009. (*Id.*; Doc. 74 Ex. 14 p. CC 1459; Doc. 74 Ex. 21). On September 17, 2009, additional lab work was completed, Dr. Waldridge was advised of the results, but no new action was taken. (Doc. 74 Ex. 14 p. CC 1459).

On September 22, 2009, Mr. Webb was paroled and released from the CCDC, and he was admitted to St. Elizabeth Hospital with complaints of abdominal and back

7

pain. (Doc 74 Ex. 23, 24, 25). On September 24, 2009, Mr. Webb's condition deteriorated and he began having syncopal episodes. (Doc. 74 Ex. 26 p. SHP Bramble 2756). On September 25, 2009, Mr. Webb died. (*Id.*)

Dr. Paris, the Plaintiff's expert, opines that the delay in "clinical contact" was too long. He states: "There are no notes of a single physician visit for Webb. Nursing notes denoting some clinical contacts began on 8-8-09, despite the fact that Webb had arrived almost 4 months earlier on 4-7-09." (Doc. 98 Ex. 11). But this is contradicted by the record. Mr. Webb was first seen for a mental health survey on June 13, then examined by Nurse Dawes on June 23, had lab tests run on July 24, more lab tests run on July 31, and an ultrasound on August 5. (Doc. 75 Ex. 5, 6, 8, 9, 12). Dr. Paris notes some of these clinical contacts in another section of his report.

Dr. Paris points out the ER discharge instructions recommended a low-sodium, low-protein diet with a vitamin supplement and the records do not indicate this was followed. (Doc. 98 Ex. 11). Further, Dr. Paris opined that Mr. Webb's blood ammonia levels should have been monitored and Lactulose given to reduce serum ammonia levels. (*Id.*) Dr. Paris also states that blood tests aimed at determining platelet and Prothrombin levels should

have been conducted and follow-on platelet transfusions, fresh frozen plasma transfusions and vitamin K should have been administered.  (*Id.*)

In addition, Mr. Webb showed a 100-degree fever on August 14, 2009 and the doctor directed the nursing staff to administer 1 gram of Acetaminophen which is "contraindicated in the cirrhotic patient, as it is somewhat hepatotoxic."  (*Id.*)

The records reviewed by Dr. Paris appear to end on 9-10-09, and do not include Mr. Webb's final ER visit after being released from CCDC custody.  (*Id.*)

Dr. Paris opines that these alleged deficiencies caused Mr. Webb discomfort and a shortened life-span.  Dr. Paris finds that denying full diagnostic and therapeutic measures and refusing to see Mr. Webb for the first four months shows the physician was deliberately indifferent to Mr. Webb's serious medical needs.  (*Id.*)

SHP's expert, Dr. Bazzel, begins his analysis once SHP was aware of Mr. Webb's possible medical condition on July 22, 2009.  (Doc. 58 Ex. A p. 16-17).  He points out that Mr. Webb must have had cirrhosis related to his Hepatitis C infection for quite some time, but the records were not clear if he was symptomatic when admitted to the CCDC facility.  Dr. Bazzel states more lab tests could have been

conducted to further quantify the degree of liver dysfunction but the results would not have changed the management of the disease. (*Id.*)

Dr. Bazzel points out that elevated serum ammonia levels cause alterations in a patient's ability to think which is obvious to all, but Mr. Webb showed no signs of this behavior. (*Id.*) Platelets are also commonly decreased in patients with Hepatitis C, but rarely so low that intervention is required. (*Id.*) Further, Mr. Webb's ammonia and platelet levels were normal when he was admitted to the hospital. (*Id.*) The hospital did not start Mr. Webb on fresh frozen plasma and platelets until September 25, the day he died, even though he was admitted September 22. (Doc. 75 Ex. 17).

Dr. Bazzel also points out that the "pro-thrombin time is the most sensitive indicator of hepatic dysfunction (cirrhosis) and is very useful in monitoring patients who have Hepatitis C but do not yet have cirrhosis." (Doc. 58 Ex. A p. 16-17). Because Mr. Webb already had cirrhosis, this lab value would have "little (if any) clinical use" and would be "a waste of the tax payers' money." (*Id.* at 17). It was Dr. Bazzel's conclusion that Mr. Webb was treated appropriately during his incarceration, and malpractice and deliberate indifference were not present.

*Analysis*

A.   Legal Standards

Section 1983 prohibits any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" from depriving any U.S. citizen "of any rights, privileges, or immunities secured by the constitution and laws."  Plaintiff argues that his Eighth Amendment right to adequate medical care was violated.

"As applied to prisoners, this constitutional guarantee encompasses a right to medical care for serious medical needs." *Perez v. Oakland County*, 466 F.3d 416, 423 (6th Cir. 2006)(citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)).  However, because the Eighth Amendment prohibits mistreatment only if it is tantamount to "punishment," courts have imposed liability upon prison officials only where they are "so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain." *Perez*, 466 F.3d at 423 (internal quotations and citation omitted).

"Negligence or medical malpractice alone cannot sustain an Eighth Amendment claim, absent a showing of deliberate indifference." *Id.* (citing *Estelle*, 429 U.S. at 105-06).

"Deliberate indifference" has both an objective and a

11

subjective component. *Id.* (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)).  With respect to medical needs, the need "must be objectively, 'sufficiently serious.'"  *Id.* at 423-24 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

"In considering the subjective component, this circuit has emphasized that a plaintiff must produce evidence showing that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."  *Id.* at 424 (internal quotations and citation omitted).  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."  *Farmer v. Brennan*, 511 U.S. 825, 838 (1994).  *See also Id.* at 842 (official must act or fail to act "despite his knowledge of a substantial risk of serious harm").

The subjective component "prevents medical-malpractice claims from being transformed into constitutional claims."  *Quigley v. Thai*, 707 F.3d 675, 681 (6th Cir. 2013) (citation omitted).

**B.  Qualified Immunity**

Assuming a plaintiff raises a triable issue as to whether a constitutional violation occurred, a public official sued in his or her individual capacity may still be shielded from suit under the doctrine of qualified immunity.  All defendants here assert this defense.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

**B.  Application to Eversole's Claims**

**1.  Objectively Serious Medical Need**

"A plaintiff may establish the serious medical needs requirement in one of two ways.  First a medical need is sufficiently serious if it is 'so obvious that even a lay person would easily recognize the necessity for a doctor's

13

attention.'" *Blosser v. Gilbert*, 422 F. App'x 453, 460
(6th Cir. 2011) (quoting *Blackmore v. Kalamazoo County*, 390
F.3d 890, 897 (6th Cir. 2004)).

Second, "if the medical need is less obvious, its
seriousness is evaluated by the effect of delay in
treatment," and plaintiff must "place verifying medical
evidence in the record to establish the detrimental effect
of the delay in medical treatment." *Id.*

If, as the Plaintiff alleges, Mr. Webb was jaundiced,
it would be an objectively serious medical condition.  That
is, a lay person would recognize the need for a doctor's
attention.  Since the facts must be construed in favor of
the Plaintiff on the Defendants' Motion for Summary
Judgment, there are facts indicating that Mr. Webb was
jaundiced.[3]  This satisfies the objectively serious medical
need component.

### 2.    Deliberate Indifference: Subjective Component

However, even though Mr. Webb's medical condition was
a serious medical need, there is no evidence from which a

---

[3] CCDC defendants' make a hearsay objection to some of the
evidence indicating Mr. Webb was jaundiced.  There is other
evidence in the record from which a reasonable jury could
find Mr. Webb was jaundiced, without relying on the
possible hearsay evidence.  However, it is immaterial
because Eversole fails to show deliberate indifference.

reasonable jury could conclude that any of the defendants
were deliberately indifferent to those needs.

### a.  CCDC Defendants

The Plaintiff argues that defendants Buckler and
Fickenscher were aware of facts from which they could, and
did, draw an inference that a substantial risk of serious
harm existed as to Mr. Webb's health.  This argument fails
as a matter of law because there is no such evidence in the
record.

First, there is no evidence that Buckler was aware of
Webb's symptoms or that he had any involvement with his
treatment for those symptoms.  Further, there is no
evidence that Buckler had contact with Mr. Webb during his
incarceration nor is there any evidence that Buckler was
involved in any of the medical decisions involving Mr.
Webb.  Mr. Webb did file a grievance addressed to Buckler
with an apparent received date stamp.  (Doc. 99 Ex. 8).
But the Plaintiff concedes Buckler never responded to this
grievance and there is thus no other evidence showing
Buckler had any knowledge of Mr. Webb's medical status.
(Doc. 99 p.2).

The standard is clear: the "plaintiff must produce
evidence showing that the official being sued subjectively
perceived facts from which to infer substantial risk to the

prisoner, that he did in fact draw the inference, and that
he then disregarded the risk." *Perez v. Oakland County,*
466 F.3d 416, 424 (6th Cir. 2006) (internal quotations and
citation omitted). There is no evidence that Buckler
perceived facts from which to draw such an inference. And
even if there were such facts, there is no evidence showing
he did actually draw such an inference. Thus, the
subjective requirement of deliberate indifference fails as
to Defendant Buckler.

Defendant Fickenscher's only involvement in Mr. Webb's
medical care was his responses to Mr. Webb's grievances
which complained about a lack of medical care. (Doc. 74
Ex. 9, 12). Both grievances discussed Mr. Webb's concern
about his jaundice, request for blood work, and his
inability to see a doctor. But to the extent that the
grievance expressed dissatisfaction with his medical care,
Fickenscher's response does not demonstrate deliberate
indifference. "The mere denial of a prisoner's grievance
states no claim of constitutional dimension." *Alder v.
Corr. Med. Serv.*, 73 F. App'x 839, 841 (6th Cir.
2003)(citing cases holding that denial of a grievance is
not the same as the denial of a request to receive medical
care).

In fact, Fickenscher forwarded the grievance to the

medical staff, who reviewed Mr. Webb's medical file and reported the various actions that medical had taken to address Mr. Webb's medical needs. Fickenscher also responded directly to Mr. Webb, noting that the medical staff had placed Mr. Webb's name on the list to see the doctor and that the medical staff had already resolved the second grievance. (Doc. 74 Ex. 10, 13). This is affirmative action by Fickenscher to ensure Mr. Webb received appropriate medical care.

Thus, no reasonable jury could conclude that Fickenscher was aware of any serious risk to Mr. Webb's health and that he disregarded that risk.[4]

With no underlying constitutional violation, Eversole can state no "municipal liability" claim as to Campbell County. *See Blackmore v. Kalamazoo* County, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers.") (citation omitted).

For these reasons, all the CCDC defendants are

---

[4] Eversole argues that Buckler and Fickenscher were aware of general problems with the medical contractor at the CCDC. That, however, provides no basis for the claim against them in their individual capacity where it is undisputed that they played no role in Mr. Webb's care.

entitled to summary judgment.[5]

### b.    SHP Defendants

With respect to the SHP defendants, Eversole has abandoned her individual § 1983 claim. (Doc. 99 p. 3-4).

With respect to the claim asserted on behalf of Mr. Webb's estate, the Plaintiff's argument showing deliberate indifference of Nurse Dawes states in pertinent part: "Defendant Dawes [sic] assertion that Mr. Webb was not jaundiced is an indication that she deliberately chose to close her eyes to the fact that everyone else around Mr. Webb could tell; that he was jaundiced." (Doc. 98 p. 6). The Plaintiff's argument regarding deliberate indifference of Dr. Waldridge states in pertinent part: "Specifically, the refusal of Dr. Waldridge to see Mr. Webb prior to July 24, 2009, shortened Mr. Webb's lifespan and caused unnecessary pain and discomfort for a terminally ill patient." (Doc. 98 p. 6). Further, during oral argument, Plaintiff stated that the focus of the complaint is on the first two-month period, from May 18, 2010 through July 24, 2010. However, both of these arguments fail as a matter of law.

---

[5] The Court thus need not reach the issue of qualified immunity, although the individual defendants would obviously be entitled to that defense given the absence of any constitutional violation.

First, Nurse Dawes's failure to diagnose Mr. Webb as jaundiced does not give rise to deliberate indifference. While it could be negligence, deliberate indifference requires a higher standard: that there were facts to infer a substantial risk, that the inference was made, and that the risk was disregarded. The diagnosis that Mr. Webb was not jaundiced is prime facie evidence that Nurse Dawes did not draw the inference that Mr. Webb was jaundiced.[6]

For the Court to find that a failure to diagnose Mr. Webb with jaundice is tantamount to deliberate indifference, with no other supporting facts, places the Court in a position to determine which medical decisions rise to constitutional violations. There is no other evidence in the record to show that Nurse Dawes drew an inference of Mr. Webb's serious medical need and disregarded it. The bilirubin levels the Plaintiff argues show Mr. Webb was jaundiced were taken a month after Nurse Dawes saw Mr. Webb. But even if the test occurred the same day, a negligent diagnosis would not, by itself, create deliberate indifference. *Quigley v. Thai*, 707 F.3d 675, 681 (6th Cir. 2013)(noting that the subjective component is to prevent medical-malpractice claims from becoming

---

[6] Nurse Dawes's deposition was also never placed in the record.

constitutional claims).

Further, once Nurse Dawes was on notice of the seriousness of Mr. Webb's medical condition, she requested Mr. Webb be transferred for closer observation, which was denied by Dr. Scott A. Haas, Medical Director for the Kentucky Department of Corrections. (Doc. 75 Ex. 15).[7] There are no facts that Nurse Dawes inferred a substantial risk and disregarded it. Thus, the Plaintiff fails to establish that Nurse Dawes acted with deliberate indifference and she is entitled summary judgment.

Second, Dr. Waldridge's failure to see Mr. Webb does not rise to deliberate indifference. The Plaintiff is required to show Dr. Waldridge had sufficient facts to infer a substantial risk to Mr. Webb, that he actually made the inference, and that he then disregard the risk. But there is no evidence showing Dr. Waldridge had facts available to him that would have allowed him to infer a substantial risk to Mr. Webb before July 24, 2009, and even if there were such facts, no evidence in the record shows Dr. Waldridge made such an inference and disregarded it. It was not until July 25, 2009, when the test results ordered by Dr. Waldridge came back, that indicated Mr. Webb had serious liver problems. (Doc. 75 Ex. 10). After the

---

[7] Scott A. Haas is not a Defendant.

lab results were returned, Dr. Waldridge ordered follow-up blood testing and an ultra sound. (Doc. 75 Ex. 9, 11, 12). He further sent Mr. Webb for a surgical consult to see if his gallbladder needed to be removed. (Doc. 75 Ex. 9). There is thus no evidence that Dr. Waldridge was deliberately indifferent and as such he is entitled to summary judgment.

Further, even after August 19, 2009, when Mr. Webb was diagnosed with cirrhosis and hepatitis C while at St. Elizabeth Hospital, he received no specific treatment for his illnesses. (Doc. 98 Ex. 11). But even this would not rise to the level of deliberate indifference. Mr. Webb was seen again by the medical staff on September 7, 2009 and again on September 10, 2009. (Doc. 75 Ex. 9, 16). Continuing tests were conducted on September 17, 2009. (Doc. 75 Ex. 16). And finally, on September 22, 2009, Mr. Webb was released from CCDC custody. (Doc. 74, Ex. 24). Thus, medical monitoring continued up until the time Mr. Webb was released and a showing of deliberate indifference fails. *See White v. Corr. Med. Serv., Inc.*, 94 F. App'x 262, 264 (6th Cir. 2004) ("Although White did not receive the care he wanted, the conduct he alleged did not constitute a deliberate indifference to his medical needs."); *Graham v. County of Washtenaw*, 358 F.3d 377, 385

(6th Cir. 2004) (noting that where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law.") (citation omitted).

With no underlying constitutional violation, Eversole can state no "municipal liability" claim as to SHP. *See Blackmore v. Kalamazoo* County, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers.") (citation omitted).

Additionally, Eversole has adduced no admissible evidence of a clear and persistent pattern of deliberate indifference to inmate medical needs. This Court has already held in another case that the same affidavits submitted by Plaintiff here regarding allegedly poor care at the CCDC by SHP are: (1) inadmissible for a variety of reasons, and (2) even if admissible, inadequate as a matter of law to support a municipal liability claim against Campbell County or SHP. *Fryman v. Campbell County*, Covington Civil Action No. 09-114-WOB-JGW, Docs. 25, 30.

Finally, the report of Eversole's expert witness, Dr. Joseph Paris, raises no triable issue. (Doc. 98 Ex. 11). According to Dr. Paris, the failure of the physician to see

Mr. Webb during his four month jail stay "was deliberately indifferent to Webb's serious medical needs." However, this is an improper conclusion of law that goes to the ultimate issue and is not admissible at trial. *Cutlip v. City of Toledo*, 488 F. App'x 107, 119-21 (6th Cir. 2012). As such, it raises no genuine issue of material fact.

Finally, Dr. Paris's report is silent as to the subjective perception of these defendants, and the record thus remains devoid of evidence that would satisfy the subjective element.

All defendants are thus entitled to summary judgment on Eversole's § 1983 claim. Given this disposition, the Court will decline to exercise its supplemental jurisdiction over Eversole's state law claims. *See* 28 U.S.C. § 1367(c).[8]

Therefore, having reviewed this matter and heard oral argument, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** (1) that the motion of the Campbell County defendants for summary judgment as to plaintiff,

---

[8] Further, Plaintiff concedes all the state law claims against CCDC should be dismissed and that the outrage and loss of consortium claims against Buckler and Fickenscher should be dismissed. (Doc. 99 p. 1). Plaintiff also concedes that the loss of consortium claim, the state regulatory claims, and the outrage claims should be dismissed against all the SHP defendants. (Doc. 98 p. 1).

Kimberly Eversole (Doc. 74) be, and is hereby, **GRANTED AS TO PLAINTIFF'S FEDERAL CLAIM;** (2) the motion of Southern Health Partners for partial summary judgment as to plaintiff, Kimberly Eversole (Doc. 75) be, and is hereby, **GRANTED AS TO PLAINTIFF'S FEDERAL CLAIM**; and (3) Plaintiff Kimberly Eversole's state law claims be, and are hereby, **DISMISSED WITHOUT PREJUDICE.**

This 10th day of October, 2013.



Signed By:
*William O. Bertelsman*  WOB
United States District Judge